### ERALDI v. NORTH AMERICAN ACC. INS. CO.

#### No. 20255–S.

District Court, N. D. California, S. D.

Sept. 22, 1937.

J. Francis Shirley, of San Francisco, Cal., for plaintiff.

J. Hampton Hoge, of San Francisco, Cal., for defendant.

ST. SURE, District Judge.

There was bad blood between David J. Eraldi and Henry Lourdeaux. On the night of July 23, 1936, they engaged in mortal combat, and Eraldi was shot to death by Lourdeaux.

Plaintiff, mother of the deceased, as beneficiary in a policy of insurance issued by defendant company to deceased, sues for the amount alleged to be due under the terms of the policy. The policy provides that payment will be made in the event of the death of the insured "effected directly and independently of all other causes through external, violent and accidental means." Admittedly death was caused by external and violent means, but the difficult question presented for decision is whether, under the facts and the law, death was caused by "accidental means."

Eraldi and Lourdeaux were residents of the town of Sonoma, the former conducting a haberdashery and the latter an electrical business. The shooting occurred about nine o'clock at night on the main street of the town in front of Eraldi's haberdashery. The facts of the tragedy are related by three eyewitnesses, Mr. and Mrs. Roy Hansen and Raymond Grant Roberts, a youth sixteen years of age.

Mr. Hansen is an employee of the State Highway Department, and resides at El Verano, Sonoma County. He and his wife came to town to meet a person at the Sebastiani Theatre. At about ten minutes to nine Hansen parked his automobile near the theatre, about sixty feet from the entrance to Eraldi's store and on the same side of the street. He and his wife were sitting in the front seat of a coupe, their small child between them. They had an unobstructed view of Eraldi's store and what happened thereabouts. Hansen and his wife saw a man, whom they later recognized as Lourdeaux, standing on the sidewalk in front of Eraldi's store and heard Eraldi angrily cursing him. Lourdeaux had a letter or letters in his hand. He made no reply to Eraldi's profanity. "I never heard him say anything," testified Hansen. Lourdeaux walked toward the post office. Eraldi was heard to say something about a gun, and then shouted after Lourdeaux, "You better come back and

finish it." There was an awning over Eraldi's store. The street lights were lit. There was a dim light in the back of the store, "but I could see the entrance to the store and all that." "I saw Mr. Eraldi come out of his store," "he sort of peeked up toward the post office, * * * and he went back in the store again." After Lourdeaux left the post office he walked past Eraldi's store. "I saw Mr. Eraldi come out of his store," "sort of sneaking," having "a club or bat," "it appeared like a baseball bat"; he "sneaked up behind him and there was something said," Lourdeaux turned halfway round, and with the bat in both hands, Eraldi swung at Lourdeaux with his full strength, striking him a severe blow on the head which seemed to stun him. Eraldi struck a second blow. "I could not not tell whether it hit or not, it looked like a glancing blow, and I heard Eraldi say, 'You son of a bitch, you have a gun.'" Eraldi was standing in close proximity to Lourdeaux. Just then Raymond Roberts came out of a nearby candy store on skates, went between the two men, and "Eraldi seemed to grab him around the shoulder some way," and "started backing toward the store entrance." The boy slipped and fell. "There was a shot fired, and a second later I heard another shot, and then I saw Mr. Eraldi coming out of the store and toward us * * * and there were two more shots fired after that."

"Q. At the time what was he doing with this boy who had come into collision with him there? A. Well, he was holding him and trying to protect himself.

"Q. And swinging with the bat? A. Yes."

Eraldi backed away, holding the boy in front of him. Lourdeaux followed and shot twice. When the boy fell Eraldi came out of the entrance, and Lourdeaux again fired twice. Eraldi crumpled and fell into the gutter. The fight took place within a radius of fifteen feet and happened in "a very short time."

Mrs. Hansen knew the parties. She heard Eraldi loudly abusing Lourdeaux, who said nothing. He went on to the post office.

"Q. While he was in the post office did you see Mr. Eraldi? A. Yes, I noticed he was peeking out of the door of his store just as Mr. Lourdeaux came out of the post office."

Eraldi jumped back when he saw Lourdeaux coming. The front of the store was

not lighted. "There was a light in the back of the store, like the office." Lourdeaux walked past the store. Eraldi "ran out of the store and up behind Mr. Lourdeaux, and made a swing at his head."

"Q. Was it just a light tap, or was it a hard blow? A. A very heavy blow. You could hear it hit.

"Q. When he swung it did he have two hands on the bat, or just one? A. Two hands."

"Q. Was there more than one blow struck? A. Yes, he made the second blow."

Lourdeaux seemed dazed when struck. After the second blow "Mr. Lourdeaux took the gun out of his pocket, and about that time a youngster came along on roller skates and kind of bumped into Mr. Eraldi. Mr. Eraldi grabbed the little boy with his left hand like this, and the little boy backed up to Mr. Eraldi."

"Q. During this time, what was he doing, if anything, with the baseball bat? A. He was trying to hit Mr. Lourdeaux again.

"Q. He was swinging at him with the bat? A. Yes, he was, and cursing him at the same time.

"Q. Then what happened about the little boy and this man, did they get tangled up? A. Yes, Mr. Eraldi tried to keep behind the little boy, or, we will say, boy, he wasn't very little, and the child, being on roller skates, lost his balance, that is, while they were going backward, and Mr. Lourdeaux followed and shot.

"Q. Did this all happen over quite a period of time? A. It happened very quick."

There were four shots.

"Q. Did this all happen over a large space of ground or sidewalk, or did the whole thing occur within a matter of feet? A. Oh, just about in the width of the sidewalk."

Raymond Grant Roberts, 16, with skates on, glided out of the candy store. He saw Mr. Lourdeaux walking in an ordinary manner past Eraldi's store. He saw Eraldi rush out of his store with a baseball bat.

"Q. You say he rushed out? A. Yes.

"Q. Was he running? A. Well, running like a man generally does, he wasn't really running, kind of a real fast walk."

"When Mr. Eraldi struck him (Lourdeaux) he turned and grabbed me because I was right behind him and I had skated between the two of them, and brought me around where I had my back to Mr. Lourdeaux and was facing Mr. Eraldi.

"Q. Then what happened? A. Well, Mr. ——— I fell then and fell into the doorway of the store."

"Q. About how much distance do you think there was between the place where you and Eraldi came together and the place where you fell down? A. Well, there must have been about five feet."

Just before the witness collided with Eraldi, he heard him say something that sounded like "Look out, he's got a gun."

"Q. I understand then that almost at the same instant that Eraldi struck the blow, you collided with Eraldi. A. Yes, he just had a split second's time and turned around," and "grabbed me."

The witness saw only one blow struck. "It was apparently a hard swing." After the witness fell down, he saw the flashes of Lourdeaux's pistol, and two shots went above him. He then got on his knees and scrambled into the store.

"Q. What was the time in which all this happened that you have described, that is the time of your seeing Lourdeaux, and Eraldi rushing out of the store and striking Lourdeaux, and your seeing the two shots fired? How much time do you think was consumed? A. Well, there was about thirty seconds in all.

"Q. It happened very quickly? A. Yes."

Dr. E. J. Finnerty was summoned from the theatre after the shooting. Lourdeaux was walking around in a circle, with his hand over his face. He was bleeding profusely, blood was down the front of his clothing and all over the sidewalk. "I saw that he was stunned. I got him to sit down on the curb, and he said, 'Go down and see what happened to the other fellow.'"
"I went down the street and found Eraldi. He was dead. I went back to Lourdeaux. A bystander assisted me place him in my car." "We took him by each arm and put him in the car." "When we got to my office we took him by the arms and put him in the chair in my dressing room, and he said, 'I feel very faint,' and I quickly cleaned off the head, cut the hair back, looked at the wound, and I saw a rather extensive, about a two-inch abrasion on the head. I said, 'We will have to put a stitch in here because there may be an infection in there.' * * * He slumped

off the chair, and the deputy sheriff and I pulled him back up again and I put the stitch in and we carried him and put him in the bed in the next room." The Doctor examined the body of the deceased and thereafter made a post mortem. Deceased was about five feet seven inches in height, weighed 150 pounds, well developed physically. A very large blackjack was found in the hip pocket of deceased. It was quite heavy—a dangerous weapon. The post mortem showed four bullet wounds in the body. The Doctor was of the opinion that any one of the four shots would have proved fatal, but that "the one that passed through his heart, cut the tip off his heart, the apex, that was the one that caused death."

"Q. That is the one when he dropped? A. Yes.

"Q. Did that shot come from the front or did that shot penetrate him from the back? A. That shot was in the front.

"The Court: Q. The shot that killed him entered— A. The front.

"Q. Two shots entered the body from the front? A. Yes, two shots in the front and maybe one in the side and the back.

"Q. Were the shots in front close together? A. No, there was one on this side and one on this side.

"Q. Both of those shots went through the body? A. Yes."

"Q. It was a close-up shot and Eraldi was facing the weapon that shot him and killed him instantly at the time, the bullet entering the front? A. Yes."

The defense called Henry Lourdeaux as a witness. He exhibited to the court a scar and a protuberance on his forehead, the result of the fatal encounter, but refused to testify on the ground that it might incriminate him.

Counsel for plaintiff admits that: "Eraldi's actions were treacherous. His violent conduct unconscionable." But urges that when Eraldi attacked Lourdeaux he did not know that he was armed; that as soon as he learned he was armed, he abandoned the fight; and that therefore "the killing of the insured was an unforeseen and unexpected occurrence, a result which could not have been reasonably anticipated by the insured, and which was not the natural or probable consequence of any act of his."

As to the contention that Eraldi did not know or have reason to believe that Lourdeaux was armed: "The deceased engaged in an encounter under such circumstances that he invited his adversary to mortal combat, and either foresaw or should have foreseen that death or injury might result." Employers' Indemnity Corp. v. Grant (C.C.A.) 271 F. 136, 139, 20 A.L.R. 1118. The doer of a voluntary act is chargeable with knowledge of that which is usual or to be expected. "A person intends the ordinary consequences of his voluntary act." Section 1963, subd. 3, Code of Civil Procedure of California.

It is argued that the killing was for revenge and not in self-defense. "A period of time came when Lourdeaux, even though excited and dazed, must have known his life and safety were no longer imperiled," says counsel for plaintiff. "Eraldi was trying to get away. He was using a boy as a shield. He struggled over a space of ten or fifteen feet. He and the boy fell down. The boy had time to get up and start crawling through the door before the shots were fired, and Eraldi had gotten to his feet. All during this time Lourdeaux was following up with his gun pointed, waiting for a clear shot. He followed Eraldi into the entrance way, shot two bullets into his body, and then followed him out of the entrance way and shot him twice more, the last shot being fired when Eraldi was about at the curb. This action cannot be called self-defense."

▆▆▆ From the inception of the difficulty, Eraldi was the aggressor. He called Lourdeaux vile names, challenging him to fight. The light in his store was dimmed, and he peered out of the doorway watching Lourdeaux as he returned from the post office. He was lying in wait for him. With murder in his heart he rushed upon Lourdeaux, attacking him from the rear. Holding in both hands a deadly weapon, a baseball bat, he swung with might and main at Lourdeaux's head. Lourdeaux turned and received the full force of the blow upon the frontal bone. Had he been struck upon a vulnerable part of the cranium, he might have been killed instantly or seriously and permanently injured. Eraldi voluntarily put his life at stake, and deliberately took the chances of being killed. "Where the insured brings about an assault upon himself by his own wrongful act, or where he, under such circumstances that he would naturally be presumed to know that the injury is likely to be inflicted, voluntarily incurs an obvious hazard of this character,

or places himself in a position that may be reasonably expected to bring about an assault upon him, an injury so received is not effected by accidental means." Brief on "Accidental Means" by Cornelius, page 59, and cases cited.

Plaintiff's counsel says Eraldi had time to think and know that "his life and safety were no longer imperiled." Shaken by a stunning blow, blood pouring from the wound inflicted, it is probable that Lourdeaux was temporarily bereft of the power of reason, and acting instinctively for the preservation of his life, he whipped out his revolver and slew his assailant. The evidence shows that the time in which the killing occurred might be measured in seconds.

All of the facts and circumstances, the close proximity of the combatants, the limited space of battle, and the short time elapsing till the end, completely negative the idea of Eraldi's abandonment of the affray.

The regrettable killing was in hot blood, and under the evidence and the law was not caused by "accidental means."

Judgment for defendant for costs.