**Joyce A. HARRINGTON, Plaintiff,**

v.

**NEW YORK LIFE INSURANCE COMPANY, a corporation, Defendant.**

**No. 39371.**

United States District Court,
N. D. California, S. D.

March 31, 1961.

Allan Brotsky and Charles W. Decker, San Francisco, Cal., for plaintiff.

McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendant.

OLIVER J. CARTER, District Judge.

This is an action for double indemnity benefits in the amount of $15,000 under two policies of insurance issued by the defendant, New York Life Insurance Company, to Arnold Harrington, the deceased, as insured. The single indemnity life insurance benefits under the policies have already been paid to Mr. Harrington's widow and the beneficiary, Joyce A. Harrington, the plaintiff in this action, and there is no dispute concerning those benefits.

Mr. Harrington was fatally injured by a self-inflicted gunshot wound on February 5, 1960 and died the same day. This action was commenced on August 17, 1960 by the filing of a complaint in the Superior Court of the State of California, in and for the City and County of San Francisco. On August 29, 1960 the action was removed to this Court by defendant, pursuant to the provisions of 28 U.S.C. § 1441(a). This Court has jurisdiction of the action under the provisions of 28 U.S.C. § 1332.

The sole issue in the case is whether the death of Arnold Harrington "resulted directly, and independently of all other causes, from accidental bodily injury * * * *" within the meaning of the double indemnity provisions of the policies. The plaintiff submitted appropriate proof of death in which plaintiff represented the cause of death to be "accidental shooting." In its answer defendant has declined to pay the double indemnity benefits. There is also lurking in the record under this defense (though not vigorously made) the suggestion by the defendant that the death was the result of suicide and therefore excluded under the double indemnity provisions of the policies. The parties agree that this case is controlled by the California law on the subject, since the contracts of insurance were issued in California, and the incident, which is the subject of this suit, occurred in California.

The facts, which are practically undisputed, are as follows.

Mr. Harrington, the insured, was a laboratory technician by occupation and was thirty-eight years old. He was married to the plaintiff herein, and as the issue of that marriage there were five children living in the home, the eldest being age eleven. He was happy in his occupation, which at the time of his death was bringing him an income from $1,000 to $1,200 per month. His financial condition was relatively good, in that other than secured obligations for payments on his home and automobile, and current living expenses, all of which were currently in good standing, he had no financial obligations. His health and the health of his family were good, with the exception that he had an ulcer which was in a controlled condition. His family relationship appeared to be a happy one. There is no history of suicidal threats or tendencies. He had a hobby of collecting guns. Mrs. Harrington was fearful of guns, and did not participate in her husband's hobby. At the time of his death he was the owner of a number of rifles and hand guns of various types, among them the German Mauser semi-automatic pistol with which he fired the fatal shot. Mr. Harrington fired his guns frequently at a firing range, was quite familiar with

them, was an expert shot, and prided himself upon his knowledge of guns. On the day of his death Mr. Harrington had been home from work with an adverse reaction to a flu shot, and he had a minor quarrel with his wife concerning her overstaying a visit with a girl friend. Mr. Harrington had been drinking, but did not appear to be intoxicated. The quarrel continued and Mr. Harrington left the house in anger, returning approximately an hour later. Upon his return Mrs. Harrington refused to make up with her husband or to reply to him. At that time present in the room was the oldest child, a son aged eleven. Mr. Harrington, saying words to the effect that he might as well do something he enjoyed, started handling the Mauser semi-automatic pistol. The pistol was loaded with one shell in the barrel, or firing chamber, and eight or nine shells in the magazine. He was causing the gun to make a clicking noise. According to the evidence this could have been done in one of three ways, all of which involved causing the hammer to be released from a cocked or semi-cocked position to firing position, while the safety lever was on safe. The safety mechanism on the gun was so designed that even though the hammer dropped toward the firing pin it would not strike the firing pin while the safety lever was in the safe position. After a number of clicks Mrs. Harrington requested him to stop, saying in substance "Please don't do that, you know it makes me nervous" or "you know its dangerous," to which Mr. Harrington replied that the gun was safe, and "see, I'll show you." Whereupon he placed the gun to his head and the gun fired, causing the gun shot wound through his head which caused his death shortly thereafter.

There was expert testimony concerning the condition of the gun and the operation of its mechanism. The significant factors are that there was little, if any, probability that the gun would fire when the safety lever was in the position of safe, one witness saying the chances were a million to one, and that this was so regardless of how the hammer was released; that the only way the gun could be fired was when the safety lever was in a fire position; that as a matter of general safety practice with respect to firearms it was "dangerous" to point a firearm loaded, or unloaded, with the safety on, or off, at any vital part of the body. Under these circumstances the Court finds:

(1) That the death was produced by a gun shot wound, which was caused by the voluntary act of the deceased;

(2) That deceased knew the gun was loaded, but he thought the safety lever was in a safe position and that the gun would not fire in that condition, and, further, that the gun could be pointed at his head safely in that condition;

(3) That at the time of the firing the safety lever of the gun was in the fire position, but that this condition was unknown to and unexpected by the deceased; and

(4) That the deceased had no intention to take his own life.

Under these facts plaintiff contends that death occurred from "accidental bodily injury", and defendant contends that as a matter of law death could not have so occurred because the act of pointing a loaded gun at his head by the deceased was either suicidal or so inherently dangerous that death followed as a foreseeable consequence.

While defendant suggests that the conduct of the deceased might have been suicidal, the main thrust of its argument is based upon the proposition that the death was non-accidental because of the performance of a dangerous act from which death was a foreseeable consequence. Defendant's reluctance to strongly urge that the death was the result of a suicidal act is confirmed by the evidence. Other than the minor family quarrel which occurred on the day of the shooting, there was no factor in Mr. Harrington's life which either directly or indirectly supports the inference that he intended to take his own life at the time of the shooting, or at any other time. Such factors as his condition of

health, his financial status, his family status, and his mental condition, are all negative on the question of suicidal intent. The act of pointing a loaded gun, which he thought was safe, at his head, which might be characterized as foolish or dangerous, under the circumstances in which it occurred in this case is not suicidal. Plaintiff, therefore, has carried the burden that the death was not the result of suicide.[1] See Wilkinson v. Standard Acc. Ins. Co., 180 Cal. 252, 180 P. 607; Canada Life Assurance Co. v. Houston, 9 Cir., 1957, 241 F.2d 523.

The other portion of the defendant's contention raises a more difficult question, namely, whether under the circumstances of this case the non-suicidal death was caused by accidental bodily injury. In this situation it is the duty of this Court to determine what the courts of last resort of the State of California would hold under the facts of this case. In Young v. Aeroil Products Co., 9 Cir., 1957, 248 F.2d 185, the court said at page 188:

"Preliminarily, it should be noted that the law of California governs the substantive issues in this case. It was in that state that the machine was purchased and used and where the fatal accident occurred. It is our limited duty to discern the substantive law of California on the issues in controversy and to apply it accordingly. Our task is not to innovate, but to imitate. Where the course of the law remains uncharted, as is the situation with several of the issues in the instant case, it is the duty of the Federal court to examine germane precedents and analogous decisions in California and to endeavor to ascertain from those decisions how the California courts would decide the case at bar. In the absence of direct authority, we must heed such guideposts as the state courts have constructed, for even here true allegiance to the principle of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 precludes unrestrained and independent determination in a diversity case."

There are a number of California cases dealing with the interpretation of insurance policies which provide for death payments as the result of accidental deaths. Careful research by counsel and by the Court fails to disclose any California case which closely resembles this case on its facts, and it would be difficult to say with certainty what the California courts would hold under these circumstances. The California cases seem to make a distinction between insurance policies which insure against accidental death, and a death caused by accidental means, holding that those policies which insure against death from accidental means require proof not only "that death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to injury or death." Rock v. Travelers' Ins. Co., 172 Cal. 462, 156 P. 1029, 1030, L.R.A.1916E, 1196.

There is a suggestion in later California cases that this distinction no longer is valid. Cox v. Prudential Ins. Co., 172 Cal.App.2d 629, 637, 343 P.2d 99. See also: Zuckerman v. Underwriters at Lloyd's, 42 Cal.2d 460, 473, 267 P.2d 777. In any event the distinction is of no moment in this case, because the policy in this case insured against death from accidental bodily injury and would fall in the "accidental results" type of case as distinguished from the "accidental means" type of case, the latter requiring a greater quantum of proof. It is the conclusion of this Court that the proof in

---

1. In its brief defendant asserts that the burden of showing that death was not the result of suicide was on the plaintiff, citing Zuckerman v. Underwriters at Lloyd's, 1954, 42 Cal.2d 460, 267 P.2d 777. If defendant's assertion is the holding of the Zuckerman case plaintiff here has met that burden. It is unnecessary for this Court to determine whether or not the Zuckerman case so holds.

this case is sufficient to establish that death resulted from accidental bodily injury under either standard.

This conclusion is based upon the definition of "accidental" as that term is used in accident insurance policies. The earliest California case dealing with the definition of this word in the context of insurance cases is Richards v. Travelers' Ins. Co., 89 Cal. 170, 26 P. 762, where the court said:

"It is impossible to give a precise definition of the word 'accidental.' As every effect has a cause, there is one sense in which nothing is accidental.

"Accident policies are of recent origin, and there have been only a few judicial decisions with respect to them. But the authorities to be found on the subject seem to be to the point that 'accident' must be given its popular meaning; that is, a casualty—something out of the usual course of events, and which happens suddenly and unexpectedly, and without any design on the part of the person injured. The fullest discussion of the subject is to be found in the opinion of the United States circuit court for the district of Michigan, in the case of Ripley v. Railway Company, [Fed.Cas.No.11,854], 2 Bigelow's Life & Acc. Ins. Cas. 738. In that case the insured had been attacked by highwaymen, and killed, and it was contended that as the *highwaymen intended* violence, there was no accident. The learned judge (Withey, J.,) in delivering the opinion of the court, says: 'Perhaps, in a strict sense, any event which is brought about by design of any person is not an accident, because that which has accomplished the intention and design, and is expected, is a foreseen and foreknown result, and therefore not strictly accident. Yet I am persuaded this contract should not be interpreted so as thus to limit its meaning; for the event took place unexpectedly, and without design on Ripley's part. It was to him a cas-

ualty, and in the more popular and common acceptation, "accident," if not in its precise meaning, includes *any event which takes place without the foresight or expectation of the person acted upon or affected by the event.* * * * I think, in construing a policy of insurance against accident, issued to all sorts of people, a majority of whom do not, as the company well knew, nicely weigh the meaning of words and terms used in it, courts are called upon to interpret the contract as a large class not versed in lexicology are sure to regard its terms and scope. That which occurs to them unexpectedly is by them called accident. The company fix the terms of the contract, and are to be held, in the absence of plain unequivocal exceptions and provisions, to intend what, in popular acceptation, the insured party is likely to understand by its terms.' * * * In that case judgment went for defendant upon another point, and was affirmed by the United States supreme court, where the meaning of 'accident' was not discussed ([Ripley v. Railway Passengers' Ins. Co.] 16 Wall. 336 [21 L.Ed. 469]); but the language of Judge Withey seems to us to express correct views of the question." 89 Cal. 175–176, 26 P. 763.

This definition, "a casualty—something out of the usual course of events, and which happens suddenly and unexpectedly, and without any design on the part of the person insured," has been repeated often in the many California cases which have subsequently dealt with the problem. Some of these cases are Price v. Occidental Life Ins. Co., 169 Cal. 800, 802, 147 P. 1175; Rock v. Traveler's Insurance Co., supra; Rooney v. Mutual Benefit Health & Accident Ass'n, 74 Cal. App.2d 885, 888, 170 P.2d 72; Zuckerman v. Underwriters at Lloyd's, supra; and Cox v. Prudential Ins. Co., supra. The essence of defendant's position is that the deceased invited death by engaging in conduct so inherently dangerous

that death was the foreseeable result. In support of its position defendant cites Postler v. Travelers' Ins. Co., 173 Cal. 1, 158 P. 1022, overruled on other grounds in Zuckerman, supra; Price v. Occidental Life Ins. Co., supra, and Eraldi v. North American Acc. Ins. Co., D.C.N.D.Cal. 1937, 20 F.Supp. 735. In all of these cases the deceased started an altercation, which resulted in the death of the deceased caused by a shot from a gun fired by the other person to the altercation. In each of these cases the court held that in a case where the deceased invited death from a deadly weapon in the hands of another person the killing was a natural and probable consequence of his own voluntary act, and not an accident. In Postler, supra, the court said:

"The appellant contends, and we think upon good ground, that under any reasonable view of the evidence, the injuries suffered by Postler were not produced by accidental means, but were the natural and probable consequence of his own voluntary acts. In Western Commercial Travelers' Ass'n v. Smith, (85 Fed. 401, 405, [40 L.R.A. 653, 29 C.C.A. 223, 227]), the court said that 'an effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of the means which produced it * *' (See, also, 4 Cooley's Briefs on Insurance, p. 356; Fidelity, etc., Co. v. Stacey's Exr's, 143 Fed. 271 [6 Ann. Cas. 955, 5 L.R.A.(N.S.) 657, 74 C.C.A. 409 [5 L.R.A.(N.S.) 657, 6 Ann.Cas. 955]]; Price v. Occidental Life Ins. Co., 169 Cal. 800, [147 Pac. 1175]; Rock v. Travelers' Ins. Co., 172 Cal. 462, [156 Pac. 1029, L.R.A. 1916E, 1196]; Hutton v. State Accident Ins. Co., 267 Ill. 267, [Ann.Cas. 1916C, 577, L.R.A.1915E, 127, 108 N.E. 296]; Prudential Casualty Co. v. Curry, 10 Ala.App. 642, [65 South

852].) In Price v. Occidental Life Ins. Co., we had occasion to deal with a situation somewhat similar to the one before us. The insured had been killed by the discharge of a revolver held in the hands of another person. It was held that 'if it should appear that the killing had been the result of an encounter with deadly weapons, and that the deceased had himself invited and brought on such conflict, the fatal result would not have been accidental so far as he was concerned.' The decision of the United States circuit court of appeals in Taliaferro v. Travelers' Protective Ass'n of America (80 Fed. 368, [25 C.C.A. 494]), was cited with approval. There the court upheld a directed verdict in favor of the insurance company, it appearing that the insured had invited another to a deadly encounter which had resulted in his killing. Under the undisputed facts, we do not see how the case at bar can be taken out of the principle of those just referred to. Postler, after arming himself and declaring his intention of getting back his money, had gone to the gambling-house and had there undertaken to compel the payment of one thousand dollars at the point of a pistol. While he was engaged in this effort, an encounter took place between him and one of the men who was in the place when he arrived. In the course of this encounter he was killed.

"A man who attempts to obtain money from others by the display of a deadly weapon, aiding such display by threats of killing, must contemplate, as the natural and probable consequence of his actions, that there will be resistance to or interference with the consummation of his plan, and that such resistance or interference will be likely to result in armed conflict and serious injury to one or more of the participants. To all intents and purposes, Postler's position, so far as concerns the probable consequences of his acts, was

that of any man who attempts robbery at the point of a firearm. If such a man were killed by his intended victim, it could hardly be claimed that his death was caused by 'accidental means,' in the sense in which those words are used in policies like the ones before us. We are not suggesting that, from an ethical standpoint, Postler's action was to be judged by the standards which would be applied to the commission of an ordinary robbery. The conditions under which he had lost his money in gambling may have been such as to make him feel, whether rightly or wrongly, that he was justified in resorting to extreme and lawless measures in the effort to recoup his losses. But these considerations do not affect the ultimate question, which is whether the killing was the natural and probable consequence of his own voluntary acts. Under the authorities above cited, this question must be answered in the affirmative." 173 Cal. 4–5, 158 P. 1024.

Plaintiff's position is that death in this case was accidental because it was the unexpected and unforeseeable result of a voluntary act, and plaintiff urges that, although the deceased's voluntary act of pointing a loaded gun at his head was both dangerous and unnecessary, death was the result of the deceased's mistaken belief that the safety lever of the gun was in a safe position, and that, therefore, the gun would not fire.

In support of her position plaintiff cites a number of cases, among which are Cox v. Prudential Ins. Co., supra, and Rooney v. Mutual Benefit Health & Accident Ass'n, supra. In both of these cases the deceased had placed himself in a position of peril by a voluntary act of his own. In Cox, supra, the deceased had deliberately and voluntarily jumped out of a moving vehicle in which he was being transported as a prisoner by law enforcement officers, and was killed by a following vehicle. In Rooney, supra, the deceased started a fist fight, and was knocked to the ground and killed by striking his head against the sidewalk. Both of these cases are subsequent in time to the California cases cited by the defendant. Both quote from the case of Losleben v. California State Life Ins. Co., 133 Cal.App. 550, 556, 24 P.2d 825, with approval:

"While an injury to an insured person may result in greater or less degree from an original voluntary act upon his part, if there is some evidence which justifies the inference that the means which produced the injury contained something of an unexpected or unforeseen character involving other acts not intentionally done, the resulting injury may be said to be caused through accidental means." 133 Cal.App. 556, 24 P.2d 827.

In Rooney, supra, it is said:

"The rule in California is that each case must stand upon its own facts and that the legal principles enunciated as to what constitutes 'accidental means' as distinguished from 'accidental result' must be applied to such facts as appear in the particular case. These principles, applied to the facts of this case, do not support appellant's claim that when one invites a fistic encounter and sustains injury or death therefrom recovery cannot in any case be had upon policies of the character here involved. To prevent a recovery upon such a policy, it must be made to appear that in utilizing the means to which he resorted the insured knew or should have known that he would probably sustain the injury which resulted as a consequence thereof." 74 Cal.App.2d 890, 170 P.2d 75.

These more recent California cases seem to teach that, even though death may be the result of a voluntary act of the deceased in which the deceased started in motion a perilous course of conduct, death may be accidental where there is some act or occurrence in the course of conduct which is unanticipated and

unexpected by the deceased, and from which it cannot be said reasonably that death was the natural or probable consequences of such conduct. The cases are not clear on where reasonable foreseeability ends and the unexpected begins, but seem to leave that question to the facts of each case.

Here the facts would seem to support the conclusion of accidental death rather than death as the foreseeable result of a dangerous or perilous course of conduct. It does not require expert opinion to establish that it is dangerous or perilous to point a loaded gun at one's head in the parlance of general safety practices in the handling of firearms. However, this does not mean that every death which results from the performance of such conduct is not an accident. If, as expert testimony showed here, the gun had a safety mechanism which reasonably could be anticipated to prevent firing, and consequently death, when properly used, then it cannot be said that death was the foreseeable result of pointing the loaded gun if the one pointing the gun thought, and had good reason to believe, that the gun was in that condition. The conduct of the deceased here could be called foolish, stupid, dangerous, perilous, unnecessary and many other characterizations of a similar import, but in the context of the surrounding circumstances it would require a strained appraisal of the facts to say that what occurred was not unexpected and unforeseen by him. Before he pointed the gun at his head he had been doing the same unsafe, mechanical manipulation with the gun by causing the hammer to be released toward the firing pin with the safety lever in a safe position without firing the gun. His announced purpose for putting the gun to his head was to demonstrate the safety of the gun in that condition. It was his mistaken belief that the gun was safe which produced the unexpected occurrence. It can be argued with some degree of plausibility that the deceased should have foreseen what probably happened here, namely, that somehow, in the manipulation of the gun he inadvertently moved the safety lever from a safe position to a fire position just before putting the gun to his head. In other words, should he have anticipated the mistake which caused his death? The answer is that in the common understanding an occurrence which happens as the result of a mistake is usually an accident. When weighing probabilities in this area the courts seem to require some element of certainty of the end result by the means used, without the intervention of some act or occurrence of an unexpected nature, such as a mistake, before holding that death is a foreseeable consequence. Here the end result of death would not have occurred but for the mistaken and unexpected condition of the gun. The Court, therefore, concludes that death in this case resulted directly from accidental bodily injury.

Defendant has cited a number of cases from jurisdictions other than California which are not supported by the weight of authority in California, or are distinguishable on their facts. These cases are Kinavey v. Prudential Ins. Co. of America, 1942, 149 Pa.Super. 568, 27 A.2d 286, (doing acrobatic stunts on the rail of a bridge while intoxicated); Allred v. Prudential Ins. Co. of America, 1957, 247 N.C. 105, 100 S.E.2d 226 (a fourteen year old boy killed as the result of lying down in the middle of a highway to show how brave he was); Ford v. Standard Life Ins. Co., Tenn.1947, 12 C.C.H. Life, Health and Accident Cases 789, (handling a venomous snake under the religious belief he could handle such snakes without harm); Thompson v. Prudential Ins. Co. of America, 1951, 84 Ga.App. 214, 66 S.E.2d 119 (playing a form of "Russian roulette"); and Baker v. National Life & Acc. Ins. Co., 1956, 201 Tenn. 247, 298 S.W.2d 715 (permitting a person to shoot at a can on the insured's head). There should be added to the cited cases Trivette v. New York Life Ins. Co., 6 Cir., 1960, 283 F.2d 441 (shooting self with pistol). What was said in Cox, supra, seems apropos here:

"Appellant cites several other cases in support of its contention

that the death was not caused by accidental means. Those cases are factually distinguishable from the present case. It may be stated generally that in those cases the death was the direct result of the voluntary act of the insured (such as jumping from a high building or the top of a moving train) and no act of an intervening agency was involved; or that the death resulted from performing a daredevil stunt (such as handling a rattlesnake, playing Russian Roulette, or permitting a person to shoot at a can on the insured's head); or that the death resulted from fighting with guns." 172 Cal.App.2d 638, 343 P.2d at page 104.

There are outside cases which seem to support plaintiff. See Aetna Life Ins. Co. v. Kent, 6 Cir., 1934, 73 F.2d 685; and Peppers v. Sovereign Camp, W.O.W., 1936, 53 Ga.App. 851, 187 S.E. 215.

During the course of trial defendant objected to and moved to strike certain pre-death conversations by deceased and statements by plaintiff made shortly after the occurrence. The Court admitted the evidence and reserved ruling on the objections and motions to strike. The objections are overruled, and the motions denied. At the conclusion of the plaintiff's case defendant moved to dismiss on the ground that the evidence, as a matter of law, did not establish that death occurred from accidental bodily injury within the meaning of the two insurance policies in question. Ruling was reserved. The motion to dismiss is denied.

Prior to the taking of evidence plaintiff requested the right to amend the pleadings to conform to proof on the question of interest. Plaintiff should forthwith present her proposed amendment, so that final judgment can be prepared and entered after the question of interest is determined.

Judgment is awarded plaintiff in the amount claimed, subject to the determination of the question of interest. Under the provisions of Rule 52(a), F.R. Civ.P., 28 U.S.C. the findings and conclusions in this memorandum shall constitute the findings of fact and conclusions of law of the Court, except on the issue of interest, and counsel for plaintiff is directed to prepare and present a judgment in accordance herewith after the determination of the question of interest.