Martha M. MYORE, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 94–255.

United States Court of Veterans Appeals.

Oct. 31, 1996.

Theodore C. Jarvi, was on the brief, Tempe, AZ, for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Peter M. Donawick, Washington, DC, were on the brief, for appellee.

Before KRAMER, IVERS, and STEINBERG, Judges.

STEINBERG, Judge, filed the opinion of the Court. IVERS, Judge, filed a dissenting opinion.

STEINBERG, Judge:

The appellant, Martha M. Myore, widow of deceased veteran Kenneth B. Myore, appeals a December 3, 1993, Board of Veterans' Appeals (BVA or Board) decision finding that the veteran's death was the result of his own willful misconduct. Both parties have filed briefs. For the reasons that follow, the

Court will vacate the BVA decision and remand the matter for proceedings consistent with this opinion.

## I. Background

The veteran served in the United States Marine Corps (USMC) from May 1984 until his death on May 26, 1990. R. at 16, 28. His induction medical examination report did not reflect any psychiatric disorders. R. at 28–29. With respect to medical history, he reported having had family counseling for two months in 1976 related to his parents' separation. R. at 31. Service medical records (SMRs) did not disclose any treatment for mental disorders. R. at 33–65, 68–72, 75–92.

A June 6, 1990, USMC Report of Casualty stated that the cause of the veteran's death was a "self[-]inflicted gunshot wound to the head" that occurred while the veteran was at the Sacaton Indian Reservation in Arizona on authorized leave from active duty. R. at 16, 117, 122–23. The incident was investigated by the Pima Agency, Law Enforcement Service, Bureau of Indian Affairs [hereinafter Pima Agency]; the Gila River, Arizona, tribal police; and the Federal Bureau of Investigation (R. at 93–98, 103–14, 118–19, 125); in addition, the Office of the Medical Examiner for Maricopa County (R. at 100–02) and the USMC (R. at 73, 115, 117, 120–24, 126) made reports.

An August 1990 USMC report of the investigation surrounding the veteran's death revealed the following: The shooting occurred at the home of the veteran's friend, Leah Schurz, on the Reservation. There were two weapons in the veteran's possession, a .38 caliber revolver and a .25 caliber semi-automatic; they were contained in an ammunition can that the veteran had removed from the trunk of his car and had brought into the house. When he removed the weapons from the can, both were unloaded. The veteran handed the weapons to another friend, Roger Sabori; after looking at both weapons, Sabori gave them back to the veteran. R. at 73, 121–22. Eyewitness Reynold Ramirez recalled that the veteran had placed the .25 caliber semi-automatic back in the "ammo can" and that he had "stated: 'This is what my troops do sometimes['] pointing the .38 to his head and

pulling the trigger". R. at 124. The veteran then put one round in the .38 revolver cylinder, spun the cylinder, put the revolver to his head, and pulled the trigger. R. at 73. He then spun the cylinder again, and the gun fired the second time he put the loaded revolver to his head and pulled the trigger. R. at 73, 124.

The USMC report noted that the veteran had come to Ms. Schurz's house to watch a basketball game, arriving about 7:00 p.m. on May 25th; that everyone at the house had been drinking for approximately ten hours and that the shooting took place at approximately 5:15 a.m. on May 26th; that approximately 35 minutes had elapsed before the ambulance or police were called after the shooting; and that the veteran had lived approximately 11 hours after being taken by air evacuation from Sacaton hospital to St. Joseph's hospital in Phoenix where he had been pronounced dead by Dr. Shetter at 5:00 p.m. on May 26th. The military report concluded that the cause of death was a gunshot wound to the head and that the veteran's "familiarity, formal training, and experience with weapons in general were very extensive." R. at 123.

The USMC report also noted that "there [was] no doubt that [the veteran] knew the weapon was loaded"; that the veteran had "followed no safety precautions in the handling of the weapon"; and that the veteran had "held the weapon in his right hand at an upward arch at the right temple". R. at 121. The investigating officer's opinion was that "the shooting [had] occurred as a result of [the veteran] and his friends playing with a .38 caliber revolver"; that the veteran and his friends "were under the influence of alcohol at the time of the shooting"; and that "the shooting was an accident". *Ibid.*

A May 26, 1990, emergency medical services (EMS) report noted a "self[-]inflicted gunshot to r[ight] of head entrance, exit l[eft] above ear, [with] .38 cal[iber] revolver]". R. at 74. Reported findings included alcohol on the veteran's breath and "'friends' state [that he was] messing around with [a] gun". *Ibid.* A Pima Agency incident report, dated May 28, 1990, provided information consistent with the above report and noted that

tribal police officers had assisted in the investigation by securing the scene and conducting interviews. R. at 94.

A May 26, 1990, Pima Agency narrative report noted that, upon the investigator's arrival at the scene of the shooting within approximately one hour after it had occurred, witness Roger Sabori was observed at that time carrying a military ammunition box that was then seized. R. at 103. The same individual was then observed interfering with the performance of work by the ambulance attendants. *Ibid.* The report noted that he was "intoxicated". *Ibid.* Another Pima Agency investigative report of that date stated that witness Sabori was arrested on a charge of interfering with the duties of the police, for hostile and uncooperative conduct, and for hindering officers and the criminal investigator from conducting an investigation and obtaining evidence at the scene. R. at 105.

A Pima Agency investigator noted that, upon entering the house where the shooting had occurred, he had found the "living room to be strangely almost bare" and had observed a male on the floor of that room. R. at 108. Present were Ms. Schurz and Mssrs. Ramirez and Sabori. *Ibid.* The investigator stated that Mr. Ramirez told him that the veteran "was playing around with a pistol and shot himself in the head" and that he, Mr. Sabori, and the veteran "were consuming alcoholic beverages in the living room on the floor". *Ibid.* Mr. Ramirez noted that two other individuals had "passed out from intoxication". R. at 119. Mr. Sabori stated that the veteran had come over to the house around 7:00 p.m. on May 25th to watch basketball, and that they had been drinking beer. R. at 119. Other reported details of what next transpired are consistent with those provided in the USMC report. R. at 108, 119. The living room was observed "to be clear of litter and any sign of alcoholic beverages"; it was "[a]s if someone had cleaned the room." R. at 109. The sofa was in the dining room, and "[l]itter and trash which included some broken glass, [and] a broken vase, were sweep [sic] into the northeast corner of the kitchen/dining room." *Ibid.*

Another Pima Agency report, prepared on May 26, 1990, by another investigator, concluded—"based on interviews of witnesses, family members[,] and friends"—that there was "[n]o evidence to suggest the [veteran's] intent to commit suicide" and that the veteran "apparently shot himself with [a] gun while playing Russian roulette". R. at 125. (Russian roulette is defined as "a deadly game of chance in which a person spins the cylinder of a revolver holding only one bullet, aims the gun at his or her head, and pulls the trigger", WEBSTER'S NEW WORLD DICTIONARY 1177 (3rd ed. 1988) [hereinafter WEBSTER'S].) The veteran's death certificate identified the cause of death as "[g]unshot wound of head" and noted that no autopsy had been performed. R. at 142.

The Office of the Medical Examiner (ME) examined the veteran's body on May 28, 1990, at 10:30 a.m., identified the cause of death as a suicide, and also noted that an autopsy had not been performed. R. at 100. The ME's narrative summary of the circumstances surrounding the death included: "Apparently shot self with gun[;] to hospital where he died later after surgery. Playing Russian roulette...." R. at 101. An ME toxicological examination report showed that testing of ocular fluids was "negative for alcohol". R. at 102.

In July 1990, the appellant filed a claim with a Department of Veterans Affairs (VA) regional office (RO) for VA dependency and indemnity compensation (DIC) or death pension. R. at 19–22. A May 1991 VARO administrative decision determined that the veteran's death was not in the line of duty due to his own willful misconduct. R. at 135–36. In June 1991, the RO denied service connection for the cause of his death. R. at 138–39. The appellant appealed the decision to the BVA and filed a statement contending clear and unmistakable error (CUE) in the administrative and RO decisions. R. at 144–45.

In November 1991, the RO received medical records from the Sacaton hospital. R. at 148–52. The records noted, inter alia, a "self[-]inflicted GSW [ (gunshot wound) ]" to the head. R. at 150. A January 1992 RO decision denied the appellant's CUE claim

(although styled as one, this was not a CUE claim because there had not been any final RO decision, *see* 38 C.F.R. § 3.105 (1995)), concluding that there was "no evidence of mental unsoundness or any other evidence to show the existence of a psychiatric condition at the time of the self-inflicted gunshot wound to the head" and that there was "no evidence to conclude that the veteran was insane at the time of the self inflicted gunshot wound to the head." R. at 154–57, 185. In April 1992, the appellant perfected her appeal to the Board and stated that the investigation had not been properly conducted, that the veteran's death was "anything but self-inflicted", and that his death was not due to misconduct. R. at 166. In a separate statement, her representative disputed that the gunshot wound was self inflicted. R. at 187. He contended that sworn statements of witnesses were not obtained; that the trajectory of the bullet showed that it could not have originated from above the pool of blood; that the pistol was not found near the veteran; that the living room was thoroughly cleaned before the police arrived; and that other inconsistencies existed in the description of events such that the conclusions reached by the investigators could not be justified and raised "an element of doubt that the fatal wound was self-inflicted." R. at 170–72.

In the December 1993 BVA decision here on appeal, the Board found that the appellant had submitted a well-grounded claim, that the veteran had died due to a self-inflicted gunshot wound to the head while playing Russian roulette, and that the veteran was not insane at the time of his death. R. at 5. The Board denied DIC, finding that the veteran's death was the result of his own willful misconduct and was not incurred in the line of duty. *Ibid.*

## II. Analysis

### A. Generally Applicable Law

■ When a veteran dies from a service-connected disability, the veteran's surviving spouse is eligible for DIC. *See* 38 U.S.C. § 1310; 38 C.F.R. § 3.5(a) (1995). A veteran's death is due to a service-connected disability when "such disability was either the principal or a contributing cause of death." *See* 38 C.F.R. § 3.312 (1995). For such death to be service connected, it must result from disability incurred in line of duty. 38 U.S.C. § 101(16). Pursuant to 38 U.S.C. § 105(a), the following rules apply:

An injury or disease incurred during active military, naval, or air service will be deemed to have been incurred in line of duty and not the result of the veteran's own misconduct when the person on whose account benefits are claimed was, at the time the injury was suffered or disease contracted, in active military, naval, or air service, whether on active duty or on authorized leave, unless such injury or disease was a result of the person's own willful misconduct or abuse of alcohol or drugs.

38 U.S.C. § 105(a); *see also* 38 C.F.R. § 3.1(m) (1995). The regulations provide: "*Willful misconduct* means an act involving conscious wrongdoing or known prohibited action (malum in se or malum prohibitum)"; "[i]t involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences" and must be "the proximate cause of injury, disease[,] or death." 38 C.F.R. §§ 3.1(n), (n)(1), (n)(3), 3.301(c) (1995). The BVA's determination of whether willful misconduct occurred is a determination of fact subject to review by the Court under the "clearly erroneous" standard of review. 38 U.S.C. § 7261(a)(4); *see Struck v. Brown*, 9 Vet. App. 145, 153 (1996); *Cropper v. Brown*, 6 Vet.App. 450, 452 (1994). Under the "clearly erroneous" standard, "if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert v. Derwinski*, 1 Vet. App. 49, 53 (1990).

■ The Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record. *See* 38 U.S.C. § 7104(d)(1). The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Simon v. Derwinski*, 2 Vet.App. 621, 622 (1992); *Masors v. Derwinski*, 2 Vet.App. 181, 188 (1992); *Gilbert*, 1

Vet.App. at 57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of all material evidence favorable to the veteran. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table); *Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Gilbert, supra.*

### B. Line-of-Duty Presumption

■ Because the BVA decision does not indicate whether the Board accorded any weight whatsoever to the statutory line-of-duty presumption afforded by section 105(a), this matter must be addressed on the remand ordered by this opinion. The Board did not support its denial in this case by a finding that willful misconduct, under 38 U.S.C. § 105(a) and 38 C.F.R. § 3.1(n)(1), was shown by a preponderance of the evidence. *See Smith (Cynthia) v. Derwinski,* 2 Vet.App. 241, 244 (1992) ("[I]n all cases section 105 establishes a presumption in favor of a finding of line of duty. If the BVA finds that an exception does apply (in this case, willful misconduct), and denies the claim solely on the basis of such exception, the Board must establish that denial of the claim is justified by a preponderance of the evidence.").

### C. Willful Misconduct

Regarding willful misconduct, the appellant contends, first, that the veteran's death was not the result of his own willful misconduct because the gunshot wound was not self-inflicted. Second, she argues that, even if it were assumed that the veteran's wound was self inflicted while playing Russian roulette, the Board's December 1993 decision failed to discuss 38 C.F.R. § 3.302 in relation to the circumstances of the veteran's death. Brief (Br.) at 5. Finally, she contends that the Board's finding that the veteran's death was an accident rather than a suicide was clearly erroneous. Br. at 6. As discussed below, the Court concludes that aspects of the appellant's second and third contentions have merit.

■ *1. Self-inflicted wound.* In its decision, the Board found that the veteran's death was "due to a self-inflicted gunshot wound to the head while playing Russian roulette". R. at 5. This finding of a self-inflicted gunshot wound cannot be found clearly erroneous by the Court because there is a plausible basis in the record for that finding. *See Gilbert, supra.* The June 6, 1990, USMC Report of Casualty stated that the cause of the veteran's death was a "self[-]inflicted gunshot wound to the head". R. at 16, 117, 122–23. The May 1990 EMS report noted a "self[-]inflicted gunshot to r[ight] of head entrance, exit l[eft] above ear, [with] .38 cal[iber revolver]". R. at 74. The May 26, 1990, Pima Agency report included a summary of Mr. Ramirez's statement that the veteran "was playing around with a pistol and shot himself in the head". R. at 108. The Pima Agency report prepared by another officer on the same date concluded— "based on interviews of witnesses, family members[,] and friends"—both that there was "[n]o evidence to suggest the [veteran's] intent to commit suicide" and that the veteran "apparently shot himself with gun while playing Russian roulette". R. at 125. The appellant has not offered evidence, as distinguished from speculation, to the effect that the wound was other than self inflicted.

*2. Reasons or bases.* The Court concludes that, in a number of respects, the Board decision does not contain an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1).

■ *a. Application of 38 C.F.R. § 3.1(n):* The Board did not base its conclusion that the veteran's death was the result of his own willful misconduct on any specific finding as to his having engaged in "an act involving conscious wrongdoing or known prohibited action" or in "deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences". 38 C.F.R. § 3.1(n), (n)(1). In order to justify a conclusion of willful misconduct, the Board must point to the specific conscious wrongdoing or known prohibited action. Moreover, the Board must explain the relationship of these first two alternative definitions of willful misconduct

(in the first sentence of § 3.1(n)) to the apparent requirement in subparagraph (1) that willful misconduct "involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences". If the latter phrase is the determinative one, then in order to find willful misconduct the Board must specify the "deliberate or intentional wrongdoing" and explain how it occurred "with knowledge of or wanton and reckless disregard of its probable consequences". Moreover, with respect to the veteran's intake of alcohol, the Board stated:

> That the drinking of alcoholic beverages preceded the incident is certain, but the amount is not. Regardless, whether the veteran was appreciably intoxicated or not, it seems ... that at some point in the chain of events his actions ceased to be mere negligence and became the wanton and reckless disregard of the probable and foreseeable consequences of his actions. As a person experienced in handling firearms, he surely knew better than to act as he did; it is no excuse that *he was so intoxicated* as to not know what he was doing.

R. at 7 (emphasis added). Although the Board noted that the amount of alcohol consumed by the veteran was not certain, its decision also suggested that it had found that he was intoxicated. To the extent that the Board may have equated intoxication with willful misconduct, the Board failed to discuss the evidence of record that supports a finding of nonintoxication—the toxicology report prepared two days after the death of the veteran showing that the "ocular fluids were negative for alcohol" (R. at 102) and the lack of specific evidence as to the amount of alcohol consumed by the veteran. *See* 38 C.F.R. § 3.301(c)(2) (1995) ("The simple drinking of alcoholic beverage is not of itself willful misconduct.... If, in the drinking of a beverage to enjoy its intoxicating effects, intoxication results proximately and immediately in disability or death, the disability or death will be considered the result of the person's willful misconduct.").

Accordingly, the Court will vacate the Board decision and remand for the Board to address these questions and express its determination, under this regulation, in terms of particular actions that are or are not found by the Board to be "conscious wrongdoing or known prohibited action". 38 C.F.R. § 3.1(n).

*b. Suicide:* On remand, the Board must address more fully, in accordance with the following discussion in this opinion, the question whether the veteran committed suicide. The record contains evidence that the veteran's act was suicide. Although the death certificate is silent on this point, noting only "shooting" and "gunshot wound to head" (R. at 142), the Office of the Medical Examiner examined the veteran's body on May 28, 1990, noted that the veteran "[a]pparently shot self with gun" while playing Russian roulette, identified the cause of death as a suicide, and noted that an autopsy had not been performed (R. at 100–01). There was also other, less direct evidence possibly suggesting suicide that was not discussed by the Board—the veteran's having pulled the trigger a second time after it did not fire on the first pull. R. at 73.

Suicide is at issue here because if it is found to have occurred, then, under 38 C.F.R. § 3.302, a presumption of unsound mind may be activated that would negate willful misconduct. VA's regulation, which is entitled "Service connection for mental unsoundness in suicide", provides in pertinent part:

> (a) *General.* (1) In order for suicide to constitute willful misconduct, the act of self-destruction must be intentional.
>
> (2) A person of unsound mind is incapable of forming an intent (mens rea, or guilty mind, which is an essential element of crime or willful misconduct).
>
> . . . .
>
> (b) *Evidence of mental condition.* . . .
>
> (2) The act of suicide or a bona fide attempt is considered to be evidence of mental unsoundness. Therefore, where no reasonable adequate motive for suicide is shown by the evidence, the act will be considered to have resulted from mental unsoundness.
>
> . . . .

(c) *Evaluation of evidence. ...*

(2) In all instances any reasonable doubt should be resolved favorably to support a finding of service connection (see § 3.102). 38 C.F.R. § 3.302; *see Elkins v. Brown,* 8 Vet.App. 391, 397–98 (1995) (§ 3.302 "establishes presumptions concerning mental unsoundness as a result of the act of suicide or a bona fide attempt that *negate willful misconduct* ") (emphasis added); *Sheets v. Derwinski,* 2 Vet.App. 512, 516 (1992) (§ 3.302 provides that suicide is evidence of mental unsoundness and, absent a reasonable adequate motive, is considered to be the result of mental unsoundness). The appellant contends that, because there was no evidence of a reasonable adequate motive for suicide, the act resulted from mental unsoundness under § 3.302. Br. at 6–7.

The Board provided no basis for rejecting the Medical Examiner's finding of suicide, and the decision was thus deficient under section 7104(d)(1) in not providing an evaluation of all material evidence supporting the claim. *See Caluza, Gabrielson,* and *Gilbert,* all *supra.* Instead, in its decision, the Board stated: "The evidence demonstrates that the veteran did not commit suicide. All of the investigation reports in the claims folder noted that the veteran [had been] playing Russian roulette when he incurred the gunshot wound and therefore his death was an accident and not a suicide." R. at 7. The Board also concluded that "it is apparent that the veteran shot himself in the head and that suicide was not his motive for doing so". *Ibid.* Accordingly, the Board itself (or in reliance on the investigators' conclusions to that effect) equated playing Russian roulette with an accident per se and with not committing suicide. R. at 7. The Court concludes that the Board failed to provide an adequate statement of reasons or bases for making or adopting such a blanket conclusion under the facts of this case, and also failed to provide an adequate statement of reasons or bases explaining why an accidental death does not negate willful misconduct. There is considerable caselaw, usually in a life-insurance context, that deals with deaths resulting from Russian roulette and that finds or suggests that such deaths are, or are consistent with,

suicide. *See Wickman v. Northwestern Nat. Ins. Co.,* 908 F.2d 1077, 1087 (1st Cir.1990); *Koger v. Mutual of Omaha Ins. Co.,* 152 W.Va. 274, 163 S.E.2d 672, 676 (1968); *Thompson v. Prudential Ins. Co. of America,* 84 Ga.App. 214, 66 S.E.2d 119, 123–24 (1951); *see also Harrington v. New York Life Ins. Co.,* 193 F.Supp. 675 (N.D.Ca.1961); *cf. Arnold v. Metropolitan Life Ins. Co.,* 970 F.2d 360, 361–63 (7th Cir.1992); *C.M. Life Ins. Co. v. Ortega,* 562 So.2d 702, 704 (Fla.Ct.App.3d Dist.1990), *review den.,* 576 So.2d 289 (1991).

In its decision, the Board also stated: "[A]t some point in the chain of events[,] his actions ceased to be mere negligence and became the wanton and reckless disregard of the probable and foreseeable consequences of his actions. As a person experienced in handling firearms, he surely knew better than to act as he did. . . ." R. at 7. This appears to be a statement that the veteran's death was the result of willful misconduct, which under § 3.1(n) requires that the conduct be "a conscious wrongdoing or known prohibited action", one which "involves deliberate or intentional wrongdoing with knowledge of or wanton and reckless disregard of its probable consequences" (38 C.F.R. § 3.1(n), (n)(1)), and such a statement appears to be at odds with the Board's finding that the veteran's death was an "accident" (R. at 7). Webster's Dictionary defines "accident" as "a happening that is not expected, foreseen, or intended", WEBSTER's at 8.

In preparing its statement of reasons or bases in accordance with the foregoing discussion, the Board may find willful misconduct only by a preponderance of the evidence (38 U.S.C. § 105(a), *Smith, supra* ); if the Board finds that the death was caused by suicide, then the Board must apply 38 C.F.R. § 3.302 to determine whether the suicide constituted willful misconduct or whether (by finding that there was "no adequate motive for suicide", § 3.302(b)(2)) it gave rise to the presumption of unsound mind that would negate willful misconduct.

### D. Duty to Assist

In an August 24, 1995, order, the Court held in abeyance the appellant's motion to remand, which sought to have the Board

obtain the following documents pursuant to the Secretary's duty to assist under 38 U.S.C. § 5107(a): (1) An EMS communication dated May 26, 1990; (2) medical records from the St. Joseph's Hospital and Medical Center, dated May 26–27, 1990; and (3) a final medical treatment summary by Dr. Andrew Shetter dated June 15, 1990. In opposition to the motion, the Secretary noted that he had not yet transmitted the ROA at the time the motion had been filed. In her March 1996 reply brief, the appellant asserts that VA "failed to get important medical records relating to the veteran's death and mentioned in [the a]ppellant's previous Motion to Remand." Reply Br. at 5.

■ Because the appellant's claim for cause of death is well grounded based on the statutory presumption of section 105(a), on remand the Board must seek to obtain items 2 and 3, above. VA had been put on notice of the existence of these medical records, and they may contain information relevant in determining the cause of the veteran's death. *See* R. at 100 (noting location of death to be St. Joseph's Hospital); *see Godwin v. Derwinski*, 1 Vet.App. 419, 425 (1991) (duty to assist includes obligation to develop relevant facts). The Court notes that item 1 is contained in the ROA at page 74. As to the appellant's contentions regarding the quality of the criminal investigations, VA's duty to assist in this case does not extend to conducting a new criminal investigation into the circumstances surrounding the veteran's death.

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court vacates the December 3, 1993, BVA decision and remands the matter for expeditious further development and readjudication, on the basis of all applicable law and regulation, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 105(a), 5107(a), (b), 7104(a), (d)(1), 7261; 38 C.F.R. §§ 3.1(n), 3.302; *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991)—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found

at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or Court). *See Allday v. Brown*, 7 Vet.App. 517, 533–34 (1995). "On remand, the [claimant] will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

VACATED and REMANDED.

IVERS, *Judge,* dissenting:

I dissent. The ancient legal maxim, *in claris non est locus conjecturis* ("In things obvious there is no room for conjecture") fits the facts in this case.

The overwhelming evidence in this case shows that the veteran, at the time of his death, was an active duty member of the United States Marine Corps with the rank of sergeant and six years' experience, having "familiarity, formal training, and experience with weapons" (R. at 123), who engaged in a "deadly game of chance"—namely, Russian roulette. WEBSTER'S NEW WORLD DICTIONARY 1177 (3rd. ed. 1988). The unfortunate outcome of that game was the veteran's death by a self-inflicted gunshot wound. With the exception of a single checkmark indicating "suicide" on a post-mortem medical examiner's report, and the majority's conjecture, there is not one scintilla of evidence that the veteran engaged in this game of chance intending to lose, i.e., intending to kill himself.

The appellant concedes that the wound was self inflicted. Appellant's Brief (Br.) at 6–7. The appellant even declares, in her brief, that suicide is an unbelievable conclusion: "There is no evidence in the record showing that Sgt. Myore's life was of such a dismal character that he might be expected to do away with himself." Appellant's Br. at 8.

The evidence clearly supports the BVA's conclusion that the veteran's death was the result of his own willful misconduct. The facts are so clear in this case, that there is no rational basis to do anything but affirm. This is not an insurance case involving the application and interpretation of an insurance policy covering accidental death. This is a claim for dependency and indemnity compensation based upon a veteran's death incurred in the line of duty.

By remanding this case, the majority is asking the Board to ignore the existing evidence, and to attempt to plumb the depths of the veteran's psyche, and to engage in pure conjecture regarding the number of trigger pulls and the meaning thereof.